UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL J. WACKETT,

        Plaintiff,

v.                                Case No. 08-C-181

CITY OF BEAVER DAM, et al.,

        Defendants.

**DECISION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      Plaintiff Daniel Wackett, is a former employee of the City of Beaver Dam. Wackett has brought suit against the City of Beaver Dam ("City") and members of the City's Board of Public Works ("Board"), alleging that the defendants violated his right to freedom of speech under the First Amendment. In addition, Wackett has stated a breach of contract, *quantum meruit,* and unjust enrichment claim against the City of Beaver Dam, and seeks recovery of unpaid wages from the City.

      In response, the defendants now move for summary judgment as to all of Wackett's claims. Based on the pleadings, depositions, answers to interrogatories, and admissions on file, together with all the affidavits submitted, I conclude that Wackett has not established that he spoke on a matter of public concern, nor that his speech was a motivating factor in the defendants' conduct. Accordingly, the defendants' motion for summary judgment will be granted as to the First Amendment claim. The remaining state law claims are dismissed without prejudice.

**I. Background**

The plaintiff, Wackett, was the former Supervisor of Public Works for the City of Beaver Dam. While serving as Supervisor, Wackett also served as Acting Director of Public Works for the City for several years.

The defendant, City of Beaver Dam, is a municipal corporation and political subdivision of the State of Wisconsin. The co-defendants, Terry Capelle, Jeffery Kohman, Laine Meyer, and Gina Staskal were all members of the City of Beaver Dam's Common Council ("Council") and Board of Public Works. The duties of the Board of Public Works include recommending candidates to fill department vacancies to the City Council as well as recommending equipment purchases to the City Council on behalf of the Public Works Department.

On February 17, 2003, after considering bids for three different models of end-loaders, Wackett and his boss, Director Bruce Gall, presented the Board a recommendation to purchase a John Deere end-loader, the least expensive of the three bids they had received. At the board meeting, the Board members elected not to follow Wackett's and Gall's proposal to purchase the John Deere, but instead decided to recommend purchasing the Caterpillar end-loader. The Caterpillar end-loader was the most expensive of the three types considered.

As a result, Wackett claims that he objected publicly, as a taxpayer, to the Board's decision to purchase the more-expensive end-loader. In addition, Wackett claims that he also publicly spoke about his concern that the Board's decision to purchase the Caterpillar end-loader had been influenced by personal, unethical motives. According to Wackett, he spoke to several citizens about his displeasure, but the only one he names is Jeff Schmidt. Schmidt later wrote a letter to the Council, mayor and the editor of the local newspaper.

2

On February 24, 2003 the Board voted to recommend the Caterpillar end-loader to the City Council. After some debate, the City Council ultimately rejected the recommendation, and after some procedural wrangling the Board subsequently elected to purchase the John Deere end-loader that Wackett had originally recommended.

A few months after the end-loader issue was resolved, Director Gall retired from City employment after serving the City for several decades. As a result, the Board was responsible for recommending a candidate to replace Gall as Director of Public Works. Wackett was the next person in the "chain of command," and was appointed Acting Director in July of 2003 until a full-time replacement could be found.

Instead of recommending Wackett for the Director of Public Works position, the Board instead recommended John Bemis ("Bemis"). At the time, Bemis was Wackett's subordinate. The Board claims that Wackett was passed-over because he was "overbearing," "unfit for the position," and the Board did not like his management style. Bemis was appointed Director of Public Works in October of 2003. Upon hearing that he was passed over for the Director job, Wackett wrote a letter to the Board expressing his dismay, and alleged that he was not hired because of his "unwavering recommendation to the Board of Public Works to purchase [the] John Deere front-end loader."

In July, 2004 Bemis resigned as Director. Wackett sent an application to the Mayor of Beaver Dam seeking the Director position. The Board instead appointed Chris Liveris ("Liveris") as Director of Public Works. Liveris remained in the position for several months, but ultimately resigned in September, 2004. Wackett was once again appointed Acting Director of Public Works until a replacement could be found. Wackett remained Acting Director of Public Works from

3

September of 2004 until his retirement on February 15, 2008. Throughout his time serving as Acting Director, Wackett received his regular paycheck for his services as Supervisor of Public Works; however, the City never gave Wackett a "bump in pay" for performing the Acting Director duties.

After his retirement, Wackett sued the City and the aforementioned defendants asserting that his First Amendment right to free speech was infringed, in that the defendants retaliated against him by not promoting him to the Director position because he spoke-out against the Board's decision to purchase the Caterpillar end-loader. Wackett also brought a breach of contract, *quantum meruit,* and unjust enrichment claim against the City. Wackett argues that he and the City agreed that Wackett would be compensated for his services as Acting Director; and by not compensating him, the City either breached the contract or became unjustly enriched. Additional facts are set forth below where relevant.

**II. Analysis**

Under the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### A. First Amendment

Wackett alleges that the defendants intentionally denied him the position of Director of Public Works because he spoke out publicly (that is, apart from his official role) against the defendants' recommendation to purchase the Caterpillar end-loader. He argues that his speaking out on a matter of public concern was the reason the defendants denied him the Director position. Such retaliation constitutes a denial of his First Amendment right to free speech.

As established in *Connick v. Myers,* 461 U.S. 138, 140 (1983), "government employees do not lose their rights under the First Amendment to free speech and to petition the government for redress of grievances when they accept public employment." *See also Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968); *Miller v. Jones*, 444 F.3d 929, 941 (7th Cir. 2006); *Gray v. Lacke*, 885 F.2d 399, 410 (7th Cir. 1989). Thus, simply because Wackett worked for the City of Beaver Dam does not mean that his speech is not protected.

On the other hand, Wackett's status as a government employee does not afford him greater First Amendment protection than a non-government employee has. It is only when he is speaking as a citizen on matters of public concern that the First Amendment protection claimed here is available. As the Court explained in *Garcetti v. Ceballos,*

> [A] contrary rule . . . would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds no support in our precedents. When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny. To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers.

547 U.S. 410, 423 (2006).

In *McGreal v. Ostrov*, 368 F. 3d 657, 672 (7th Cir. 2004), the 7th Circuit set forth a four-step analysis to determine whether a public employee's right to freedom of speech had been unlawfully abridged by the government. *See also Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002); *Gray v. Lacke*, 885 F.2d at 412. The first two elements place the burden of proof on the Plaintiff. Thus, to survive summary judgment, the Plaintiff need only demonstrate a genuine issue of material fact, *Myers,* 226 F.3d at 825, (1) that his speech or petition pertained to a matter of public concern, and (2) his speech or petition was a substantial or motivating factor in causing his employer to take an adverse employment action against him. *See McGreal v. Ostrov,* 368 F. 3d at 672*; Gustafson v. Jones,* 290 F.3d at 906*; Miller v. Jones,* 444 F.3d at 941-2.

If the employee can establish these two elements, then the employee's claims must survive summary judgment unless the *employer* can prove two elements in rebuttal. The employer must show beyond question that (1) its interest in efficiently providing public services outweighs the employees interests in freedom of speech and petition, and, therefore, its actions against the employee based upon the employee's speech were justified (known as "*Pickering* balance test"); or (2) the employer must prove that it would have taken the same action against the employee *regardless* of the employee's exercise of his rights to free speech. *See, e.g., McGreal v. Ostrov*, 368 F. 3d at 672; *Mount Healthy City District Board of Ed. v. Doyle*, 429 U.S. 274, 287 (1977); *Gustafson v. Jones*, 290 F.3d at 906; *Miller v. Jones*, 444 F.3d at 942.

Applying those principles to this case, to survive summary judgment, Wackett must show that there is a genuine question as to whether his speech was a matter of public concern and whether the Defendants responded adversely to Wackett as a result of his speech. *See Celotex,* 477 U.S. at 322-324. In order to counter, the Defendants must show that there is no question that either their

6

actions outweighed Wackett's interest in free speech or that they would have not given Wackett the Director position regardless of his speech.

### 1. Was Wackett's Speech a Matter of Public Concern

To be entitled to First Amendment protection, Wackett's speech must relate to a matter of public, rather than personal concern. *See Connick,* 461 U.S. at 146. The fact that Wackett's speech may be motivated by a personal reason does not necessarily take away the public nature of the concern. *Id.* When evaluating Wackett's speech, this Court is to "look to whether [he . . .] sought to 'bring to light actual or potential wrongdoing or breach of public trust'" by the Defendants. *Miller v. Jones,* 444 F.3d at 944 (citing *Connick,* 461 U.S. at 148).

Wackett's claim is based on his speaking out to members of the public about his displeasure with the decision to select the Caterpillar front-end loader, as well as his allegations of ethical lapses, in particular, his view that a proposed trip to the Caterpillar factory in Illinois would be unethical and his belief that the Defendants were friendly with each other and with the Caterpillar salesman. These allegations, however, are of such a barebones nature that they are insufficient to withstand summary judgment.

The "ethics" allegation is based on Wackett's vague deposition testimony that he spoke out to certain "citizenry" in his capacity as a taxpayer. (Dkt # 48, Ex. 8, Wackett Dep. at 21.) The substance of his concern was his belief that board members were improperly influenced to buy the Caterpillar by their common membership in a social water skiing club with the Caterpillar salesman, as well as their own common membership in the local Elks club. (*Id.* at 93.) Wackett was also apparently concerned about a proposed trip to the Caterpillar factory in Illinois, although he does not say why it would be unethical for a public body to tour a facility of a company from whom it

7

was considering purchasing an expensive piece of equipment. (As it turns out, none of them ever toured the facility.) Nor does Wackett explain why it was unethical for board members to ski with tractor salesmen or to hobnob at an Elks club with fellow council members. His deposition testimony simply reflects his view that: (1) the Caterpillar product was inferior; (2) the Defendants were friendly with each other and with the Caterpillar salesman; (3) therefore they must have been acting unethically when they bought a product from their "friend."

These concerns are in the nature of trivia. Notably absent from Wackett's speech is any hint of anything untoward: there are no kickbacks, no nepotism, no sweetheart deals, no personal profits, no quid pro quos, no slush funds, nothing. In fact, there is not even an allegation that the Defendants were particularly good friends with the Caterpillar salesman – instead, all we're told is that the Defendants belonged to the same skiing club and that they might have been swayed by a possible trip to the factory that never materialized. It is difficult to envision the public becoming irate upon learning of such workaday allegations as common membership in a skiing club. And, with all due respect to our southern neighbors, the promise of a junket to an industrial plant in East Peoria, Illinois, hardly smacks of the sort of sweetener that would cloud the judgment of the average city councilman and redden their faces. In sum, the allegations are simply too anodyne to constitute matters of public concern entitled to First Amendment protection.

The same is true for the underlying end-loader issue itself. In light of *Garcetti,* Wackett is careful to argue that his case is based on his opposition to the Caterpillar end-loader that he expressed *outside* of the workplace – it was not merely something he did within the course of his duties. Yet the mere fact that he might have spoken about it to a few people outside the office does

8

not make it protected speech.[1] When divorced from any allegations of wrongdoing or improper favoritism, Wackett's speech on the issue simply constitutes one man's opinion about the merits of one industrial implement over another. If city councilmen are defrauding the taxpayers by purchasing one product, that is one thing. But without any such allegation, Wackett's speech amounts to pointing out the simple fact that they preferred one product over another, and that he disagreed with their approach. His own subjective disagreement does not make it a "matter of public concern" on its own – there must be something more. Otherwise, almost any disgruntled public employee could turn his workplace dispute into a First Amendment case merely by having a different view of things than his superiors and telling his next-door neighbor about it. The school cafeteria cook's belief that the school should buy Hunt's ketchup instead of the pricier Heinz does not become a matter of public concern merely because she also expresses that view *outside* of work – there must be something inherently public about the speech in the first place. Here, there is nothing inherently wrong about purchasing a Caterpillar end-loader – after all, it is a product made by a well-known company, a company that submitted a bid. Its principal drawback – its slightly higher price – was well-known. Accordingly, the extent of Wackett's private speech about the issue could only have been limited to his own subjective disagreement with the council about the quality

---

[1] *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Illinois* gave protection to a public employee's letter to the editor critical of the school board. 391 U.S. 563, 567 (1968). But that letter touched on matters of public concern, and the teacher had not previously expressed his opinions as a part of his official duties. Wackett does not identify any case that allows a public employee to make a public statement within the course of his job duties and then obtain protection for that statement merely by repeating the same criticisms in private. It is doubtful that the Supreme Court would allow a public employee to get around *Garcetti* merely by calling himself a "concerned taxpayer" and repeating the same criticisms in private.

9

and price of the loader, and his own disagreement does not transform the issue into a matter of public concern.

Here, I cannot conclude that Wackett was attempting to bring to light "actual or potential wrongdoing or breach of public trust'" by the Defendants because there is simply nothing wrong with visiting a factory or belonging to a social club with a salesman. *Connick,* 461 U.S. at 148. And absent allegations of actual wrongdoing, his own subjective disagreement about the proper end-loader to purchase does not constitute a "matter of political, social, or other concern to the community." *Id.* at 146. Accordingly, he has failed to satisfy the first element of his retaliation case.

**2. Did the Defendants Retaliate Because of Wackett's Speech**

Even if Wackett's speech touched on matters of public concern, to survive summary judgment he must also establish that there is a genuine question as to whether his speech motivated the Defendants to retaliate against him by not promoting him to the Director position. *See McGreal v. Ostrov,* 368 F. 3d at 672. This would require a showing that the Defendants not only knew about Wackett's out-of-the-workplace speech, but also acted on it. Based on the evidence, I am not satisfied he has met that burden.

The Defendants argue that they did not know Wackett was speaking-out against their decision to purchase the Caterpillar end-loader. Although of course they knew that he opposed the purchase in the course of his normal job duties, they did not know he was advocating against their activities in private by talking to people about it. Their proposed findings of fact state that none of the individual defendants "knew that Wackett made any statements about them outside of public meetings regarding their votes to recommend that the City purchase a Caterpillar front end loader in 2003 until this lawsuit was filed." (DPFOF ¶ 79.) Wackett has not contested this proposed

10

finding, and under Civil Local Rule 56.2(e), "the Court must conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out." That alone is a basis for granting summary judgment on Wackett's First Amendment claim.

Wackett's brief suggests that an inference of knowledge can be drawn from the circumstances, but that is not true. Most of his case for causation rests on a letter to the editor that Jeff Schmidt also sent to the mayor and council members. The letter mentioned Wackett's recommendation of the John Deere over the Caterpillar, and thus Wackett believes the Defendants must have inferred that Wackett had spoken to Schmidt about the Caterpillar *outside* his normal duties. (Porter Decl., Ex. 12.) But that is not a reasonable inference from the letter. Instead, the letter simply mentions that Wackett had initially recommended the John Deere: "I urge you to go along with the INITIAL opinion of the Director of Public Works (Bruce Gall) and the Street Superintendent (Dan Wackett), which was to purchase the JOHN DEERE unit as bid." (*Id.* (emphasis in original.)) The focus of the letter is on the author's own experience with front-end loaders ("I just might know a thing or two about equipment and in particular front-end loaders, given my experience in the Heavy Construction Industry," he writes), and the fleeting reference to Wackett's "initial" opinion suggests that the author was relying only on what Wackett recommended in the course of his duties – not anything *else* Wackett might have said on the subject outside the workplace. Thus, none of the Defendants would reasonably have inferred from the letter that Wackett was communicating his displeasure outside of his official duties.

Plaintiff also suggests that an inference of knowledge could arise because the letter just cited was "part of a vociferous public outcry." But it is not clear what Wackett means by this. If the letter were part of a public outcry, it is hard to imagine why the Defendants would draw the

11

inference that *Wackett* was the instigator of such an outcry *and* that he was doing so outside of his normal job duties. If anything, the letter quoted above suggests that the debate was about the quality and price of the various loader options – it was not about whether the board members were improperly influenced by any other considerations.

Finally, Plaintiff states that the Defendants' attitude towards him chilled after he spoke out about the issue, and he asserts that Aldermen Kohman and Capelle were out to "get" him. First, inferences drawn from timing alone are rarely enough to withstand a motion for summary judgment. *Valentino v. Village of South Chicago Heights,* 575 F.3d 664, 672 (7th Cir. 2009). Second, there is no reason to make the logical jump that Plaintiff makes here. By Wackett's own account, Aldermen Capelle and Kohman were "not pleased" with his John Deere recommendation at the initial February 17, 2003 meeting. (PPFOF ¶ 18.) In another proposed finding, Wackett asserts that they were "disgusted" with his recommendation of the Deere. (PPFOF ¶ 56.) The meeting became "heated." (PPFOF ¶ 57.) It was thus obvious that these Defendants wanted the Caterpillar and were unhappy and "disgusted" with Wackett for recommending the Deere *at the original board meeting* based on Wackett's *official* acts. This is borne out in Plaintiff's own version of events: "After Mr. Wackett and Mr. Gall made their purchase recommendations regarding the end loader purchase in 2003, the unfavorable treatment of Gall and Wackett by the members of the Board of Public Works that had preceded the end loader purchase issue seemed to increase perceptibly over what it had been before." Thus, even in Wackett's own version of events, the only reasonable inference is that the Defendants would have had ample reason to want to "get" him based solely on his own official, unprotected speech. In other words, there is no reason to infer that there was some *additional*

12

reason that they were unhappy with Wackett, for example, based on his limited speaking out to members of the public outside of his official role.[2]

In sum, Wackett's responses to the proposed findings essentially concede the point. Even accepting the spin advanced in his brief, however, I would not be able to conclude that he has established a genuine issue of material fact as to the Defendant's knowledge that he had been speaking out about any matters of public concern. Because I cannot find that the speech at issue touched on matters of public concern, and because Wackett has not adequately shown causation, the Defendants' motion for summary judgment will be granted.

**B. State Law Claims**

Wackett has also alleged several state law claims, including breach of contract and unjust enrichment, arising out of the fact that he worked as acting director of public works but did not receive any additional salary. In essence, he asserts, it is inequitable for the City to have retained his services as director without giving him a director's level of compensation.

The general rule is that when federal claims drop out of a case, a federal court will decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Several reasons underpin that rule, but in this case I conclude the most salient reason involves the nature of Wackett's state law claims. He is alleging mistreatment at the hands of local officials, and his claims involve the interpretation and application of Wisconsin's common law. Moreover, his claims involve the parties' understandings of their rights and obligations, and this could involve

---

[2]This is further supported by Wackett's own claim that Kohman said '"Now that Gall's gone, Wackett's the next to go." (Liveris Dep., p. 96, ll 22-23.) From this, one would draw the inference that the Defendants' animus was directed at *both* Gall and Wackett because of their recommendation of the Deere loader rather than from some extracurricular speaking out that Wackett might have done on his own.

13

questions of fact. Accordingly, I will follow the general rule and dismiss these claims without prejudice so that they may be pursued in a state forum. *See Groce v. Eli Lilly & Co.,* 193 F.3d 496, 502 (7th Cir. 1999) (noting general rule is dismissal unless state claims are frivolous or a "no brainer").

**III. Conclusion**

Ultimately, this is a case about a piece of equipment the Defendants never bought, and a trip to Peoria they never took. With no allegations of impropriety, the Plaintiff's speech did not touch on any matters of public concern. And even if it did, there is no evidence that any of the Defendants knew he had spoken out outside of his official job duties. Accordingly, the Defendants' motion for summary judgment is **GRANTED** with respect to the federal claims, and such claims are **DISMISSED**. The state law claims are **DISMISSED** without prejudice.

**SO ORDERED** this   11th   day of November, 2009.

  s/ William C. Griesbach
William C. Griesbach
United States District Judge